IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-260-FL

| | |
|---|---|
| WILLIAM L. RODGERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court upon Plaintiff's motion for summary judgment (DE-16) and Defendant's motion for judgment on the pleadings (DE-18). The time for the parties to file any further responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of a Memorandum and Recommendation. For the following reasons, it is RECOMMENDED that Plaintiff's motion for summary judgment (DE-16) be DENIED, that Defendant's Motion for judgment on the pleadings (DE-18) be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff applied for a period of disability, disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") on October 16, 2003, alleging that he became unable to work on July 23, 2001. (T.p.17; p.60). His application was denied initially and upon

1

reconsideration. (T.p.17). An Administrative Law Judge ("ALJ") held a hearing on the matter October 9, 2007 and, in a decision dated November 17, 2007, determined Plaintiff was not disabled during the relevant time period. (T.pp. 17-29). The Social Security Administration's Office of Hearings and Appeals ("Appeals Council") denied Plaintiff's request for review on April 18, 2010, rendering the ALJ's determination as Defendant's final decision. (T.pp.8-11). Plaintiff filed the instant action on June 24, 2010. (DE-8).

**Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.

"Under the Social Security Act, [the court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by

substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

The Social Security Administration has promulgated the following regulations establishing a sequential evaluation process to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

**ALJ's Findings**

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (T.p.19). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: (1) osteoarthritis of the left knee; (2) thoracic spondylosis; (3) a history of lumbar degenerative disease with status post lumbar laminectomy; (4) a major depressive disorder; (5) a generalized anxiety disorder; (6) opioid and benzodiazepine dependence; (7) hypertension; and (8) obesity. (T.pp.19-20). However, the ALJ determined that these impairments or combination of impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (T.p.20). Based on the medical record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with limitations.

3

(T.p.20).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff was unable to perform his past relevant work. (T.p.28). However, the ALJ found there were other jobs that Plaintiff could perform and that these jobs existed in significant numbers in the national and regional economy. (T.pp.28-29). In making this determination, the ALJ relied upon the testimony of a vocational expert ("VE"). (T.pp.28-29). Based on these findings, the ALJ determined that Plaintiff was not under a disability at any time through the date of his decision. (T.p.29). The ALJ's findings were based upon the following substantial evidence in the record.

**Plaintiff's Testimony and Other Evidence of Record**

When he applied for DIB and SSI, Plaintiff was forty-one years old, with a birth date of June 5, 1961. (T.p.60). Plaintiff testified he left school after the ninth grade, but later obtained his GED from Nash Community College. (T.p.958). Plaintiff worked as a material handler from July 1992 to June 1996; as a janitor from August 1997 to December 1998; and as a cashier and assistant manager at a convenience store from January 1999 to July 2001. (T.p.141; pp.959-61). From October 2002 until July of 2003, Plaintiff received vocational rehabilitation at Tri-County Industries ("TCI") through the Department of Vocational Rehabilitation. (T.p.75; pp.961-63). He was discharged from vocational rehabilitation on July 10, 2003 as "ready for employment." (T.p.75; p.963). Plaintiff testified, however, that TCI told him he "was going to be let go because I wasn't able to pull my job duties there. I was, you know, struggling so much, and they thought it'd be best if I just stopped and pursue[d] other matters." (T.p.963).

Plaintiff testified he has recurring back problems following spinal surgery in 1995. (T.p.963-64). Plaintiff has chronic back pain in his left lower back, extending into his ribs and down his left leg. The pain also extends into Plaintiff's chest at times, which has repeatedly

4

prompted him to seek emergency medical attention in order to rule out any heart condition. (T.pp.964-65). Plaintiff has undergone three surgeries on his left knee. (T.p.965). He testified he has "a hard time walking" and occasionally his knee "gives out," causing him to lose his balance. (T.p.965). Plaintiff stated he sometimes "get[s] really dizzy and disoriented and hit[s] the floor . . . if I'm not careful at home." (T.p.966). When he "get[s] real bad off" he uses his brother-in-law's wheelchair. (T.p.966). Plaintiff related his physician's opinion that these dizzy spells could be attributed to anemia. (T.p.966). Plaintiff also described his history and diagnosis of major depression recurrent, for which he takes medication and visits a psychiatrist every three months. (T.p.967). Plaintiff stated his depression was "better than it was but it's still not where I want it to be. . . . I have a lot of bad days just, you know, just don't feel good and not have a clear mind." (T.p.967). He admitted having a history of opiate dependency, but stated he was currently only taking legitimately-prescribed pain medication. (T.p.968).

Despite his medication, Plaintiff suffers from pain daily, particularly in his rib cage and lower back. (T.p.968). According to Plaintiff, he can stand for fifteen minutes, sit for twenty or twenty-five minutes, walk for ten minutes, and lift at least a carton of milk. (T.p.969). Plaintiff uses a walker when he leaves his house. (T.p.970). Plaintiff testified he spends five or six hours a day in a reclining chair because it is the best position for his pain. (T.p.972). Plaintiff believed he is unable to perform even sedentary work due to "the amount of pain I have in my rib cage when you twist it from side-to-side and . . . getting dizzy at times when I'm sitting or standing." (T.pp.972-73).

An independent vocational expert, Ann Neulicht, Ph.D., testified there were unskilled, sedentary positions available in the national and regional economy that an individual with Plaintiff's background and limitations could perform. She suggested the positions of addresser

5

and surveillance system monitor. (T.p.978). Upon cross-examination, Dr. Neulicht testified that an individual incapable of performing simple routine repetitive tasks would be precluded from these occupations.

Plaintiff also introduced medical evidence in support of his claim, summarized in pertinent part as follows:

**Chronic Back Pain**

Plaintiff received treatment at Rocky Mount Neurosurgical Consultants, P.A. from April 20, 1995 until November 14, 2000. (T.p. 146-155). On April 20, 1995, Dr. Lucas Martinez evaluated Plaintiff for left chest pain and pain in his left leg. (T.p. 154). Plaintiff reported severe pain in his upper chest and ribs, and also "a lot of pain in the back that shoots down to the legs when he walk[ed]." (T.p.154). An MRI of Plaintiff's spine "revealed some bulging versus some herniation at T5-T6" and a "right-sided lateral disc herniation to the right." (T.p.154). After examining Plaintiff, Dr. Martinez opined that Plaintiff might have lumbar canal stenosis. Plaintiff subsequently underwent a myelogram. (T.pp.153-54).

On May 4, 1995, Dr. Martinez met with Plaintiff to discuss the results of the myelogram, which revealed a "C5-C6 herniated disc . . . not very localized towards the left side." (T.p.153). Plaintiff also had a "herniated disc on the right at T10-T11 on the right side" which was "quite dramatic." (T.p.153). However, Dr. Martinez did not believe Plaintiff had "any symptoms referable to it." (T.p.153). In addition, Plaintiff experienced lower back pain radiating to both lower limbs and had "significant lumbar canal stenosis." (Tr. 153). Dr. Martinez performed a lumbar laminectomy on Plaintiff on May 8, 1995. (T.p.152). At a follow-up visit three weeks later, Plaintiff was generally doing well other than some nausea caused by his medications. (T.p.152).

On August 24, 1995, Plaintiff returned to Dr. Martinez complaining of increasing pain in his left arm. (T.p.151). According to Dr. Martinez, Plaintiff had "multiple-level discs in the cervicothoracic as well as lumbar spine." (T.p.151). Dr. Martinez prescribed a two-week treatment of physical therapy, but observed that if Plaintiff did "not improve after the two weeks of physical therapy, he may need to have the myelogram of the thoracic and lumbar spine repeated." (T.p.151). Plaintiff returned to Dr. Martinez on September 14, 1995 complaining of pain in his spine, neck, shoulder, and chest. (T.p.151). He reported he was unable to work. Dr. Martinez renewed his prescriptions for medication and prescribed a sleep medication. (T.p.151).

On September 27, 1995, Plaintiff informed Dr. Martinez's office he was going to the emergency room for treatment for his back pain. Dr. Martinez saw Plaintiff the following day. Plaintiff had "sustained a fall and continue[d] to complain of pain in the leg and increasing pain in the back." (T.p.150). Dr. Martinez obtained lumbosacral spine x-rays and noted that

> [i]n the meantime, a job description was sent from this job. I do suspect that he is not going to be able to do this job. Probably, he should be placed on long-term disability. I also would like to refer him to a pain program. He has extensive degenerative disease of the thoracic, cervical, and lumbar spine. I believe that he is an abuser of polypharmacy. We will try to enroll him in a program at Duke or Chapel Hill.

(T.p.150). Dr. Martinez continued to treat Plaintiff on a sporadic basis for three years. Plaintiff's requests for medication were denied on at least two occasions because of suspected abuse of narcotics. Plaintiff reported he was seeking help for his addiction through Narcotics Anonymous. (T.p.148).

After an absence of two years, Plaintiff returned to Dr. Martinez in November of 2000 for an evaluation of left lateral neck pain with radiation to the left shoulder. (T.p.146). Dr. Martinez observed that Plaintiff had "full motility of the cervical spine and normal strength throughout."

7

(T.p.146). At a follow-up visit on November 14, 2000, Plaintiff "complain[ed] of tension headaches" and reported being "in a significant amount of debt." (T.p.146). Plaintiff requested "something for the headaches and something to calm him down." (T.p.146). Dr. Martinez renewed Plaintiff's prescription for Darvocet and "gave him some Zanaflex because he does have some spasms and some reversal of the lordotic curvature of the cervical spine" but refused Plaintiff's requests for tranquilizers because of his "problem with drug abuse." (T.p.146).

Plaintiff was referred to Dr. David C. Miller at Carolina Regional Orthopaedics on January 18, 2001 for an orthopaedic consultation by his primary physician, Dr. Mark Abel. (T.p.180). Plaintiff reported having "mid thoracic back pain for about 2 months without any antecedent trauma." (Tp.180). Plaintiff was working as an assistant manager at a convenience store at the time. A thoracic MRI scan revealed moderately-sized disc herniation at T5-6 and T6-7. (T.p.182). Dr. Miller administered a thoracic epidural Cortisone injection and refilled Plaintiff's prescriptions for Lortab 10 and Flexeril for treatment of his pain. A thoracic myelogram performed May 3, 2001 "showed inconsequential small disk protrusion at upper levels of the thoracic spine." (T.p.179). Dr. Miller noted Plaintiff also had "some central protrusions at the C5-6 level . . . and [a] smaller protrusion at C6-7. The T5-6 is larger of the two and does obscure some epidural fat and does contact the anterior thecal sac." (T.p.179). After discussing his options with Plaintiff, Dr. Miller recommended a T5-6 and T6-7 discography, but it was never performed. On November 29, 2001, Plaintiff returned to Dr. Miller's office complaining of "pain radiating from the T5-6 level around the left lateral rib cage." (T.p.177). Plaintiff was no longer working and believed his pain was "severe enough to merit surgery." (T.p.177). Dr. Miller ordered a repeat MRI scan to determine whether surgery was indicated. The MRI scan on December 6, 2001 "did not show any specific area of herniation compatible with [Plaintiff's] s

8

symptoms." (T.p.177). Dr. Miller noted:

> The T8-9 level appears to be the level where the marker was placed as the source of [Plaintiff's] pain. However, there was no evidence of any significant neural compression at any level. [Plaintiff] has had several diagnostic MRI's and myelograms of these areas which were not compatible with any specific area of nerve compression that accounted for his pain location. Previous attempt at discography in the thoracic spine was technically unsuccessful.

Dr. Miller recommended Plaintiff receive a left-sided facet block at the T8-9 region and that he obtain a second opinion with Dr. Reeg in Greenville. (T.p.177).

On April 11, 2002, Plaintiff saw Dr. Reeg "whose feelings were consistent with Dr. Miller's in that he did not have any significant surgical pathology in combination with his diagnostic studies and would not be the best surgical candidate." (T.p.176). At a follow-up visit at Carolina Regional Orthopaedics on May 25, 2002, Dr. Miller diagnosed Plaintiff as having "chronic thoracic back pain with multiple areas of thoracic spondylosis without any significant disc herniation compatible with his symptoms." (T.p.176). Because Plaintiff had "exhausted all of his options that we had for him, he may be a candidate for evaluation for possible facet joint radio frequency ablation rhizotomy to help with his pain." (T.p.176). Otherwise, Dr. Miller opined that Plaintiff's "best recourse will be management with medication through . . . physical rehabilitative specialists." (T.p.176).

Plaintiff's primary physician, Dr. Mark Abel, ordered a thoracic spine MRI scan performed August 5, 2005. It showed "mild central disk protrusion creating minimal compression of the anterior margin of the thecal sac" at the T5-T6 level. (T.p.530). At the T6-T7 level, there was a "[s]mall central disk protrusion" creating "mild focal compression of midline anterior thecal sac and spinal cord." (T.p.530). No other significant thecal sac compression was detected. (T.p.530). An MRI scan of Plaintiff's lumbar spine on March 14, 2006 showed "a small central

disc protrusion at the L4-L5 level" and "mild spondylosis" at the L5-S1 level.   (T.p.502).

On November 13, 2006, Plaintiff visited Dr. Raymond Baule at Atlantic Neurosurgery Consultants, P.A. for a neurosurgical consultation at the request of Dr. Abel.   (T.p.551).   Dr. Baule noted that Plaintiff's "[m]otor examination demonstrates normal bulk, tone, and power in all groups.   Sensation is grossly preserved. . . . Coordination testing reveals normal rapid alternating movements.   Gait shows normal station, stance, and stride."   (T.p.552).

**Chest Pain**

Plaintiff has sought emergency room care and has been admitted as an inpatient due to complaints of chest pain on multiple occasions.   (T.pp.156-163, 185, 191, 198, 206, 211, 287, 294, 303, 378, 390, 400, 507, 628-655).   However, attending physicians have consistently ruled out myocardial infarction.   Plaintiff's records show that his cardiac enzymes have been normal; his electrocardiograms have shown normal sinus rhythm with minimal left ventricular hypertrophy; stress testing and cardiac catherterization have shown normal left ventricular function, no ischemia, and no significant coronary disease; his blood pressure has stabilized with medication therapy; and there is no evidence of hypertensive related end-organ damage.   (T.pp. 156-73, 183-204, 301-17, 388-406).   On May 14, 2003, Dr. Abel started Plaintiff on Neurontin because he thought Plaintiff's chest pain was "neuropathic pain possibly from his thoracic pain."   (T.p.163).

**Knee Pain**

Plaintiff has long-standing problems with his left knee, having had three surgeries and a patellectomy.   (T.pp.154,174)).   He has chondrocalcinosis in the medial and lateral menisci as well as some medial joint space narrowing.   (T.p.174).   Despite these conditions, Plaintiff has been evaluated as having fairly good range of motion, good strength, and normal sensation in his

10

knees. (T.p.175). At an evaluation on July 12, 2005, Dr. A.H. Marsigli noted Plaintiff had "full range of motion of the knees with no effusion and/or instability but diffused tenderness." (T.p.427). Dr. Marsigli believed Plaintiff was able to sit and stand without difficulty, climb, balance, kneel, and crouch occasionally, and crawl and stoop frequently. (T.p.427).

### Depression and Opiate Dependency

Plaintiff suffers from anxiety and major depression, recurrent. He was hospitalized at Coastal Plain Hospital for these conditions on January 6, 2005, which was his fifth such admission. (T.pp.413, 420). Plaintiff told his attending physician, Dr. Lobao, "the main reason he had been coming is because of the opiate dependency." (T.p.413). Plaintiff stated he took ten to twelve tablets of Percocet or Lortab daily and usually ran "out of his medicine he gets from his doctor way before it is time to get refills and then he goes to the emergency room and doctor shopping to get the medicine." (T.p.413). From December 13, 2004 through January 20, 2006, Plaintiff attended group and individual therapy through the North Carolina Division of Mental Health, Developmental Disabilities, and Substance Abuse Services. (T.pp.456-98). It was consistently noted Plaintiff was making progress toward his goals. At a visit on January 24, 2007, Plaintiff stated he was "living with his sister and doing fairly well."

Further facts are set out as necessary in evaluating Plaintiff's arguments.

## Analysis of Plaintiff's Arguments

Plaintiff argues the ALJ erred as a matter of law in (1) finding Plaintiff's testimony not entirely credible; (2) failing to give appropriate weight to an opinion by Plaintiff's treating physician regarding disability; and (3) failing to consider Plaintiff's vocational aptitude and the side effects of Plaintiff's medications.

The undersigned concludes there was substantial evidence to support each of the ALJ's

determinations. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's arguments rely primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, this Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, his claims are without merit. The undersigned will nonetheless address portions of Plaintiff's specific assignments of error.

**The ALJ properly assessed Plaintiff's credibility**

Plaintiff challenges the ALJ's determination regarding the credibility of his testimony. The ALJ found that while Plaintiff's "medically determinable impairments could be reasonably be expected to produce the alleged symptoms," Plaintiff's testimony "concerning the intensity, persistence and limiting effects of these symptoms [was] not entirely credible" and unsupported by the evidence of record as a whole. (T.p.26). As the ALJ explained,

> [t]here is no evidence in the record showing that any treating physician has prescribed a device to the claimant to assist with ambulation. In fact, treatment records show normal motor strength and no impairment in the claimant's ability to ambulate and perform fine and gross movements [e]ffectively. Further, no [further] surgery has been recommended for the claimant's back, and Dr. Marsigli concluded that the claimant could perform a range of medium work. The claimant also successfully participated in a work program at TCI through Vocational Rehabilitation from October 7, 2003 to July 10, 2003, when he was released not due to his impairments but because he was "ready for employment." Dr. [Abel], the claimant's primary treating physician, indicated on July 7, 2006, follow up that the claimant's herniated disc syndrome was stable, and the claimant was coping with his pain, walking for exercise, and helping with more household tasks when seen in follow up at NC Division of Mental Health/Developmental Disabilities/Substance

> Abuse Services on September 22, 2006. He also reported improvement in his sleep. Further, the claimant had normal bulk, tone, and power in all groups and sensation was grossly preserved on November 2006 neurosurgical evaluation by Dr. Baule. In fact, he demonstrated normal coordination, gait, station, stance, and stride at that time.

(T.pp.26-27).

Plaintiff argues the ALJ overlooked "key" evidence in assessing the credibility of his testimony regarding his limitations and thereby erred. However, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ's findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing Plaintiff's credibility. Likewise, the ALJ's citations to Plaintiff's medical records constitute substantial evidence supporting his assessment. Accordingly, this assignment of error lacks merit.

**The ALJ gave appropriate weight to the treating physician's opinion**

Plaintiff contends the ALJ failed to give appropriate weight to a treating physician's opinion that he is permanently and totally disabled. In the notes from a August 31, 2003 appointment, Plaintiff's primary care physician, Dr. Mark Abel, states he "[feels] like [Plaintiff] is permanently and totally disabled due to his herniated [thoracic] disc and knee problems and depression." (T.p.339). Plaintiff asserts that whenever a treating physician states an opinion as to disability, the ALJ is required to set forth good cause for rejecting such opinion. See 20 C.F.R. § 404.1527(d) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will

13

give it controlling weight."). However, the applicable regulations distinguish between medical opinions and opinions on issues reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(e). The ALJ is required to consider all medical opinions, *see* 20 C.F.R. § 404.1527(d), which are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [an applicant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [an applicant] can still do despite impairment(s), and . . . physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). The ALJ is not required, however, to give controlling weight to an opinion on an issue reserved to the Commissioner. An opinion on disability is not a medical opinion, *see* 20 C.F.R. § 404.1527(e)(1), but represents rather an opinion on an issue reserved to the Commissioner because it is an "administrative finding[ ] dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(e). Thus, "[a] statement by a medical source that [an applicant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [an applicant is] disabled." 20 C.F.R. § 404.1527(e)(1).

Here, Dr. Abel's note indicating his belief that Plaintiff is "permanently and totally disabled" represents an opinion on an issue reserved for the Commissioner, not a medical opinion. The ALJ was therefore not required to give Dr. Abel's statement controlling weight. To the extent that Dr. Abel's statement "reflect[s] judgments about the nature and severity of [Plaintiff's] impairments," the record shows that the ALJ considered Dr. Abel's treatment of Plaintiff. The ALJ specifically found, *inter alia*, that

> [w]hen seen by his primary treating physician, Mark S. Abel, M.D., on February 28, 2006, the claimant reported continued paresthesias with numbness and tingling into the lower left extremity despite treatment with Neurontin. Dr. Abel switched the claimant to Lyrica at that time, and when seen in follow up on July 7, 2006, the claimant reported improvement in his symptoms. Dr. Abel noted

14

>at that time that the claimant's herniated disc syndrome as well as his hypertensive disorder [were] stable.

(T.p.23). The ALJ cited this finding in support of his conclusion that Plaintiff is not disabled. The findings regarding Plaintiff's treatment by Dr. Abel, together with the conclusions drawn therefrom, indicates the ALJ evaluated the medical evidence and properly considered the record as a whole. Plaintiff's argument to the contrary is unpersuasive.

### **The ALJ considered Plaintiff's vocational aptitudes and the side effects of medications**

Plaintiff claims the ALJ erred in failing to consider Plaintiff's vocational aptitudes and the side effects of Plaintiff's medications when he assessed Plaintiff's ability to work. Plaintiff concedes he was discharged from vocational rehabilitation on July 10, 2003 as "ready for employment." (T.p.75). He nevertheless contends a vocational assessment report reveals "many weaknesses in [his] vocational aptitudes." Plaintiff asserts the ALJ failed to take these weaknesses into account at the hearing when questioning the vocational expert about Plaintiff's ability to perform unskilled sedentary tasks. The ALJ's conclusion that he can perform simple routine repetitive tasks ("SSRTs") is therefore flawed, according to Plaintiff. Plaintiff further argues the ALJ failed to consider testimony indicating Plaintiff's medications make him drowsy and confused. The ALJ therefore erred as a matter of law, contends Plaintiff, in concluding that he is capable of performing work.

However, the vocational assessment report upon which Plaintiff relies as evidence of his limitations was completed December 3, 2002, only two months after his entry into vocational rehabilitation and eight months before he was discharged as "ready for employment." Moreover, the vocational assessment report specifically concludes that "[b]ased on [Plaintiff's] expressed vocational interest, and implied and assessed skill levels" he was capable of performing work as a

15

cashier or as an assembler, among other jobs. (T.p.74). The report thus tends to show that, eight months before he even completed his vocational rehabilitation, Plaintiff was capable of performing certain work. The vocational assessment report therefore supports rather than contradicts the ALJ's conclusion that Plaintiff is capable of performing work.

Moreover, the record shows that the ALJ fully considered Plaintiff's mental condition and medications before concluding that Plaintiff is capable of performing SRRTs. Plaintiff testified his prescriptions made him "drowsy" and that they "kind of confuse you some." (T.p.969). He also reported "having a hard time with my thinking at stuff right now. I don't have a clear mind of what I'm doing." (T.p.973). However, this testimony, standing alone, does not establish that Plaintiff is incapable of performing any work. In his discussion of Plaintiff's mental health history, the ALJ noted that Plaintiff experienced "some mood swings in August 2006, but his medication dosage was adjusted, and he was stable when seen on September 22, 2006." (T.p.25). Plaintiff denied medication side effects when seen on January 24, 2007. (T.pp.25,607). The ALJ specifically noted he had considered "the type, dosage, effectiveness, and adverse side effects of [Plaintiff's] medication" in evaluating Plaintiff's symptoms. (T.p.26). The ALJ recited extensively from the medical record regarding Plaintiff's recurrent history of depression and anxiety and the manner in which these conditions affected his ability to work, including the results from three consultative psychiatric evaluations. These evaluations consistently supported the ALJ's conclusion that Plaintiff is capable of performing work despite his limitations. For example, despite his diagnosis of major depressive disorder-recurrent and dysthymia, Dr. Carol Gibbs reported in her November 18, 2003 evaluation that "[w]ithin a work setting, [Plaintiff] should be capable of managing simple one or two steps, as well as slightly complex tasks." (T.p.217). Dr. Anthony Carraway evaluated Plaintiff on June 30, 2004 and diagnosed him as

16

having a mood disorder due to chronic pain with depressive symptoms. Dr. Carraway detected no

> major depressive symptoms, however. [Plaintiff] displayed no impairment of
> short-term memory and no impairment of immediate memory. He had mild
> impairment of attention and concentration. His ability to understand, retain, and
> perform instructions appears to be somewhat minimally impaired, but I suspect he
> would have more difficulty in any instructions regarding physical activity. His
> ability to perform simple repetitive tasks may be somewhat mildly impaired
> secondary to his chronic pain and irritability.

(T.p.260). Dr. Carraway repeated his evaluation of Plaintiff on May 23, 2005 and noted that

Plaintiff

> continue[d] to experience mood symptoms secondary to his chronic pain. He does
> note some improvement in his generalized anxiety symptoms. He had moderate
> impairment of short-term memory and mild impairment of immediate memory.
> Attention and concentration were minimally to mildly impaired. His ability to
> understand, retain and perform instructions appears to be somewhat mildly
> impaired. His ability to perform simple, repetitive tasks and to persist at those
> tasks is more limited by his chronic pain and might be mildly to moderately
> impaired. His stress tolerance appears to be somewhat mildly to moderately
> impaired. I do not detect any interpersonal difficulty and overall his symptoms
> appear forthrightly reported.

(T.p.426). After summarizing the relevant psychiatric evidence, the ALJ found that Plaintiff

> has mild restriction of activities of daily living; moderate difficulties in maintaining
> social functioning; moderate difficulties in maintaining concentration, persistence,
> or pace; and one or two episodes of decompensation. As a result, the [ALJ] finds
> that the claimant is unable to work at a production rate or work at jobs requiring
> complex decision making, constant change, or dealing with crisis situations and can
> perform at most [SRRTs] with limitations for only occasional interaction with
> co-workers and no interaction with the public which is essentially consistent with
> the findings of the non-examining State agency psychological consultant (See
> Exhibits 32F and 33F).

(T.p.25). Substantial evidence supports the ALJ's findings. Plaintiff's assignment of error is

therefore overruled.

**Conclusion**

17

For the reasons discussed above, it is RECOMMENDED that Plaintiff's motion for summary judgment (DE-16) be DENIED, that Defendant's motion for judgment on the pleadings (DE-18) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Wednesday, April 06, 2011.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE